**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**AYINDE A. FAIR,**

                                          **Plaintiff,**

                                                              **9:11-CV-0856**
**v.**                                                         **(MAD/TWD)**

**THOMAS FARRELL, BERNDT LEIFELD,**
**ADAM RAMIREZ, JILL FRIEDMAN,**

                                          **Defendants.**
_____

**APPEARANCES:**                               **OF COUNSEL:**

**AYINDE A. FAIR**
**01-A-3746**
Plaintiff _pro se_
Woodbourne Correctional Facility
99 Prison Road
P.O. Box 1000
Woodbourne, New York 12788

**HON. ERIC T. SCHNEIDERMAN**              **COLLEEN D. GALLIGAN, AAG**
Attorney General for the State of New York
Counsel for Defendants
The Capitol
Albany, New York 12224

**Mae A. D'Agostino, U.S. District Judge:**

### MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

In this _pro se_ prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983,

Plaintiff Ayinde A. Fair claims that Defendants violated his right to exercise his religion when

they punished him for wearing spiritually significant beads for which he had a permit.  Dkt. No.

1.  Currently pending before the Court is Defendants' motion for summary judgment pursuant to

Federal Rule of Civil Procedure 56.  Dkt. No. 45.  For the reasons discussed below, Defendants'
motion is granted.

## II. BACKGROUND

**A.    Factual Background**

Plaintiff, an inmate of the New York State Department of Corrections and Community
Supervision ("DOCCS"), is a practitioner of the Yoruba/Santeria faith.  Dkt. No. 45-2 ¶ 6; Dkt.
No. 48-1 ¶ 6.  Adherents of this faith express their commitment by wearing a long necklace of
colored beads.  *Campos v. Coughlin*, 854 F. Supp. 194, 201 (S.D.N.Y. 1994) (Sotomayor, J.);
Dkt. No. 48-2 at 12.

> Santeria adherents believe that if the practitioner wears these beads
> faithfully the beads ensure . . . protection from negative forces and
> events.  Even a simple transgression from this practice, such as
> temporary removal of the beads for some reason other than those
> recognized by adherents, or the blemishing of the beads as a result of
> their handling by someone other than the wearer, may lead to negative
> consequences for the practitioner.

*Id.*

DOCCS has a directive entitled "Religious Programs and Practices," which is applicable
to prison facilities throughout New York.  Dkt. No. 45-2 ¶ 8; Dkt. No. 48-1 ¶ 8.  Section N of the
directive is entitled "Religious Pendants, Beads and Shrines."  Dkt. No. 45-2 ¶ 9; Dkt. No. 48-1 ¶
9.  It provides that inmates "may request a permit to possess and wear, but not display, religious
beads."  *Id*.  "Beads for which a special permit has been granted may be worn only underneath
clothing so they are not visible."  Dkt. No. 45-2 ¶ 10; Dkt. No. 48-1 ¶ 10.  Pursuant to this policy,
a permit was issued to Plaintiff to possess and wear, but not display, his spiritual beads.  Dkt. No.
45-2 ¶ 11; Dkt. No. 48-1 ¶ 11.

Plaintiff alleges that on February 11, 2011, he got into a dispute with Defendant Correction Officer Jill Friedman about property issues when he moved to a new housing unit. Dkt. No. 1 at 11. Defendant Correction Sergeant Berndt Leifeld came to Plaintiff's cell to speak to Plaintiff and "immediately took" Defendant Friedman's side, stating that Plaintiff came to the housing unit causing problems. *Id.*

On March 5, 2011, Defendant Friedman was working in Plaintiff's housing unit. *Id.* When Plaintiff got to his cell, he realized that he had no electrical power. *Id.* He sat in the dark until Defendant Friedman came by. *Id.* When Plaintiff explained that he did not have power, Defendant Friedman looked at him "with a mean face and walked away." *Id.*

On March 6, 2011, Plaintiff's beads were visible. Dkt. No. 45-2 ¶ 13; Dkt. No. 48-1 ¶ 13. Specifically, Defendant Correction Officer Thomas Farrell declares that "[t]he beads were visible in the neck area above his shirt. They were visible for anyone to see . . . ." Dkt. No. 45-8 ¶ 6. Two of the strands of beads appeared, to Defendant Farrell, to be colors representative of the Bloods gang. Dkt. No. 45-8 ¶ 13. One of those strands was red and white with six large red beads. *Id.* ¶ 14. The other was red and black, with the red beads being larger than the rest, and strung on a red strand. *Id.* ¶ 15. There was a pattern on that strand of three red beads followed by a black bead. *Id.* ¶ 16. Defendant Farrell "knew from [his] training and experience that the succession of beads on [Plaintiff's] strands could stand for '031' which is Blood code for 'I got love for you blood.'" *Id.* ¶ 19.

Defendant Farrell approached Plaintiff in the mess hall and asked for his identification card. Dkt. No. 1 at 6. When Plaintiff left the mess hall, Defendant Farrell asked Plaintiff to step to the side. *Id.* Plaintiff alleges that when he explained that he had a permit for the beads, Defendant Farrell said he did not "give a shit" and that Plaintiff should "shut the fuck up." *Id.*

3

Defendant Farrell declares that Plaintiff became "belligerent and argumentative" when asked about the beads. Dkt. No. 45-8 ¶ 21. Defendant Farrell declares that Plaintiff refused three direct orders to give his beads to Defendant Farrell. *Id.* ¶¶ 22-23. Plaintiff alleges that Defendant Farrell spoke to him belligerently when confiscating the beads, stating that he was taking them "because I can" and in retaliation for Plaintiff's issues with Defendant Friedman. Dkt. No. 1 at 6. Plaintiff alleges that, throughout this encounter, Defendant Leifeld was present but "did not intervene or say anything." *Id.*

Defendant Farrell declares that "[f]urther investigation by Sgt. Leifeld indicated that DOCCS' records revealed that DOCCS had determined that [Plaintiff] was, indeed, a member of the Bloods gang." Dkt. No. 45-8 ¶ 25. Defendant Leifeld's declaration, however, makes no mention of this fact. Dkt. No. 45-9. A document entitled "Inmate Security Classification" states that "Custodial Transfer indicates subject is a member of 'Bloods.'" Dkt. No. 45-6 at 13.

After the encounter, Defendant Farrell issued a misbehavior report. Dkt. No. 45-2 ¶ 31; Dkt. No. 48-1 ¶ 31. Defendant Farrell charged Plaintiff with violating prison rules against gang activity, possessing contraband, violating direct orders, and harassing staff. Dkt. No. 45-4 at 4.[1] The report stated that:

> As [Plaintiff] entered Messhall II, I observed that he was wearing what appeared to be Santeria beads. I called the Package Room who did not have a permit on file for inmate Fair's beads, he has not been issued a permit while at Eastern. I stopped inmate Fair on the way out of the Messhall to question him about the beads due to the fact that 2 strands [appeared] to be colors representative of the Bloods gang. One of these strands was colored red and white with 6 large red beads, the other was colored red and black with the red beads being larger than the rest and the strand filled in with smaller clear beads on a red strand

---

[1] Citations to page numbers in the transcript of Plaintiff's disciplinary hearing refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

4

also there was 3 red and 1 black bead in succession on the strand. Red and black are colors used by the Bloods and the[] succession of beads might stand for 031 which is a Blood Code for "I got love for you blood." When I questioned Fair about the beads he became belligerent and argumentative. I ordered Fair to give me the beads and he refused. I gave inmate Fair 2 more orders to turn over the beads before he complied. Inmate Fair was escorted to his cell and placed in keeplock status. Further investigation by Sgt. Leifeld revealed that the FPMS overview screen for inmate Fair indicates that Fair is a member of the Bloods.

Dkt. No. 45-6 at 15.

Defendant Captain Adam Ramirez acted as the hearing officer at the Tier III hearing regarding the misbehavior report. Dkt. No. 45-2 ¶ 32; Dkt. No. 48-1 ¶ 32. Plaintiff was given some help to prepare a defense for the hearing. Dkt. No. 45-2 ¶ 40; Dkt. No. 48-1 ¶ 40. Plaintiff asked for witnesses and was granted the attendance of some witnesses at the hearing. Dkt. No. 45-2 ¶ 41; Dkt. No. 48-1 ¶ 41. Plaintiff wanted to call his sister and a Deacon Doherty as witnesses. Dkt. No. 45-2 ¶¶ 44-45; Dkt. No. 48-1 ¶¶ 44-45. Each would have testified about the Santeria religion and the significance of the beads, and Deacon Doherty would have testified about the theological basis for the colors on Plaintiff's string of beads. *Id.* Defendant Ramirez found that Plaintiff's sister's testimony would be unnecessarily duplicative of Deacon Doherty's and of the information contained in Plaintiff's file and Directive 4202. Dkt. No. 45-4 at 9. Plaintiff withdrew his request for the Deacon's testimony. *Id.* at 17. At the beginning of the hearing, Plaintiff was given a copy of the charges and the charges were explained to him. Dkt. No. 45-2 ¶ 39; Dkt. No. 48-1 ¶ 39. Plaintiff was permitted to submit evidence and examine witnesses. Dkt. No. 45-2 ¶ 46; Dkt. No. 48-1 ¶ 46. Plaintiff was present for the entire hearing over a number of days. Dkt. No. 45-2 ¶ 48; Dkt. No. 48-1 ¶ 48. Over the course of the hearing, Defendant Ramirez handled Plaintiff's beads. Dkt. No. 45-11 ¶ 24. Plaintiff believes that his beads should not be touched by another person unless that person is wearing gloves, and asserts

that he explained this to Defendant Ramirez. Dkt. No. 48 at 4. Defendant Ramirez declares that he was not aware that touching Plaintiff's beads would affect their spirituality and that Plaintiff never informed him of this belief. Dkt. No. 45-11 ¶ 24.

At the end of the hearing, Defendant Ramirez found Plaintiff not guilty of the gang activity charge but guilty of the other charges. *Id.* ¶ 21. Defendant Ramirez sentenced Plaintiff to forty-five days in keeplock along with a loss of package, commissary, and phone privileges. Dkt. No. 45-2 ¶ 52; Dkt. No. 48-1 ¶ 52. Defendant Ramirez's decision was read into the record and transcribed. Dkt. No. 45-2 ¶ 47; Dkt. No. 48-1 ¶ 47. Plaintiff was given a copy of the decision. Dkt. No. 45-2 ¶ 49; Dkt. No. 48-1 ¶ 49.

Defendant Ramirez returned four of Plaintiff's strands of beads to him on March 24, 2011. Dkt. No. 45-11 ¶ 23. Plaintiff asserts, however, that he could not place them back around his neck because they had been tainted. Dkt. No. 48-1 ¶ 51. It took "about a year" for Plaintiff to receive a new set of beads. *Id.*

On April 5, 2011, Plaintiff filed a grievance regarding the incident. Dkt. No. 45-2 ¶ 20; Dkt. No. 48-1 ¶ 20; Dkt. No. 45-6 at 4. Plaintiff stated that when he "arrived at Eastern, I possessed 5 elekes (beads). They were confiscated then returned; they only gave back 4 because the color was not on my permit. However, they were recorded on my I-64 form. Furthermore, . . . my spiritual protection was broken because the beads were touched by ungloved hands." Dkt. No. 45-6 at 4. Plaintiff requested that he be allowed to send his beads home and receive a new set of beads. *Id.* At the first level of review, the Internal Grievance Resolution Committee deferred the matter to the Superintendent for Ministerial Service. *Id.* At the next level of review, the Superintendent advised Plaintiff to address his concerns by appealing his disciplinary conviction through the disciplinary appeals process. *Id.* At the final level of review, the Central Office

Review Committee ("CORC") noted that the disciplinary "appeal mechanism affords the opportunity to remedy any factual or procedural errors in a disciplinary report." *Id*. at 2. CORC "assert[ed] that there is no prohibition from staff touching religious beads." *Id*. CORC noted that effective October 27, 2010,

> permits for religious items, Santeria beads, and shrines were suspended . . . . However, registered Santeria inmates can receive a maximum of nine multi-colored strands of beads through the Package Room . . . . Additionally, up to three strands may be worn at a time by inmates in general confinement, but they must be completely concealed from view by clothing." *Id*. CORC found that it had "not been presented with sufficient evidence to substantiate any malfeasance by staff.

*Id*.

## B.    Procedural Summary

Plaintiff filed the complaint in this action on July 22, 2011. Dkt. No. 1. Upon initial screening of the complaint, the Court dismissed two claims with prejudice: (1) Plaintiff's claim that he was verbally abused and harassed; and (2) Plaintiff's claim that former Defendant Houck interfered with Plaintiff's ability to file a grievance or access the courts. Dkt. No. 4. As a result of that Order, former Defendant Houck was terminated from this lawsuit. *Id.*

Plaintiff filed two motions for preliminary injunction. Dkt. Nos. 20 and 32. The Court denied Plaintiff's motions for preliminary injunctive relief as moot because he had been transferred from Eastern Correctional Facility to Woodbourne Correctional Facility after commencing this lawsuit. Dkt. No. 42 at 6-7.

Defendants now move for summary judgment. Dkt. No. 45. Plaintiff has opposed the motion. Dkt. No. 48.

7

### III. DISCUSSION

**A.    Legal Standard Governing Motions for Summary Judgment**

Under Federal Rule of Civil Procedure 56, summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists.  *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006).  Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.  *Id*. at 273.  The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586 & n.11 (1986).  Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material[2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party.  *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).

**B.    Legal Standard Governing Motions to Dismiss for Failure to State a Claim**

---

[2] A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson*, 477 U.S. at 248.

To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."  *Schwartz v. Compagnie Gen. Transatlantique*, 405 F.2d 270, 273 (2d Cir. 1968); *accord*, *Katz v. Molic*, 128 F.R.D. 35, 37-38 (S.D.N.Y. 1989) ("This Court finds that . . . a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties.").  Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia*, "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (emphasis added).  "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense. . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged -- but it has not shown -- that the pleader is entitled to relief."  *Id.* at 679 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

## C.    First Amendment

### *1. Merits*

Defendants argue that the complaint fails to state a First Amendment free exercise claim. Dkt. No. 45-12 at 4-8.[3] The Court finds that the complaint states a First Amendment claim, that Defendants have not shown that they are entitled to judgment as a matter of law on that claim, and that Plaintiff has raised a triable issue of fact on the merits of that claim.

Prisoners retain some measure of the constitutional right to the free exercise of religion guaranteed by the First Amendment. *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). However, due to the unique concerns of the prison setting, prisoners' free exercise rights must be balanced against the interests of prison officials engaged in the complex duties of administering the penal system. *Id*. Thus, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than

---

[3] Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (quoting *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349 (1987)) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens[4] his sincerely held religious beliefs." *Salahuddin*, 467 F.3d at 274-75 (citing *Ford*, 352 F.3d at 591). A religious belief is "sincerely held" when the plaintiff subjectively, sincerely holds a particular belief that is religious in nature. *Ford*, 352 F.3d at 590. Here, Defendants do not dispute that Plaintiff's religious belief regarding his spiritual beads is sincerely held. Dkt. No. 45-12 at 4-8.

Defendants argue that no substantial burden was imposed on Plaintiff's sincerely held religious belief. Dkt. No. 45-12 at 6. A prisoner's sincerely held religious belief is "substantially burdened" where "the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin*, 76 F.3d 468, 476-77 (2d Cir. 1996) (punctuation omitted) (holding that Rastafarian prisoner's sincerely held religious belief that he was prohibited from submitting to a test for latent tuberculosis was "substantially burdened" where he was forced to

---

[4] Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord*, 571 F. Supp. 2d 477, 497 n.10 (S.D.N.Y. 2008) (citations and some punctuation omitted).

choose between "submitting to the test or adhering to [his] beliefs and enduring medical keeplock".

Defendants argue that Plaintiff's religious beliefs were not burdened because "Plaintiff was permitted to wear . . . beads before and after the incident on March 6, 2011." Dkt. No. 45-12 at 6. Plaintiff notes that although he was permitted to wear his beads, in practice he was punished for wearing them. Dkt. No. 48 at 6.[5] He rhetorically asks, "If plaintiff is not to wear his beads on his neck, where is he supposed to wear them?" *Id.* He states that "[t]here is no other way for Santeria beads to b[e] worn but on the neck and wrist, and a special bead is made for that." Dkt. No. 48-1 ¶ 13.

Defendants have not submitted any evidence that it is possible for an inmate to wear the beads around his neck, as required by the Santeria faith, without some of the beads being visible above the inmate's clothing. As the moving parties, the burden is on Defendants in this motion. Further, this Court is required to grant special solicitude to civil rights litigants such as Plaintiff who are proceeding *pro* se. Defendants have not met their burden on this element. Therefore, the Court finds that, for the purposes of this motion, Plaintiff's sincere religious beliefs were substantially burdened by Defendants' actions.

Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin*, 467 F.3d at 275 (quoting *Ford*, 352 F.3d at 595) (punctuation omitted). Although the defendants' burden is "relatively limited,"

---

[5] Citations to page numbers in Plaintiff's opposition memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

the legitimate penological interest advanced must have been the *actual* reason for the defendants'

actions. "Post hoc justifications with no record support will not suffice." *Id*. at 276-77.

Here, Defendants identify prison safety and security as the legitimate penological interest

justifying their conduct. Dkt. No. 45-12 at 7. Specifically, they cite Defendant Farrell's concerns

that Plaintiff's beads signified his affiliation with the Bloods and represented a Blood gang

greeting. *Id*. at 7. It is true that "prison security is a compelling state interest, and . . . deference

is due to institutional officials' expertise in this area." *Cutter v. Wilkinson*, 544 U.S. 709, 725

n.13 (2005). "However, defendants cannot merely brandish the words 'security' and 'safety' and

expect that their actions will automatically be deemed constitutionally permissible conduct."

*Campos*, 854 F. Supp. at 207.

DOCCS has long asserted prison security as the rationale for limiting inmates' use of

Santeria beads. In the *Campos* litigation, which occurred nearly two decades ago, DOCCS

officials asserted that Santeria "beads promote and facilitate gang activity and violence because

they are gang identifiers easily displayed to fellow gang members or rivals in the controlled

prison setting." *Id*. This, the officials argued, justified their *pre-Campos* policy of completely

prohibiting the wearing of the beads. The officials argued that even if the beads were worn under

clothing, "the beads may be viewed when plaintiffs remove their clothes or might be seen through

their clothing." *Id*. at 208. After a full evidentiary hearing, the court rejected that position and

directed the defendants to allow inmates to wear the beads underneath their clothing. *Id*. at 214.

The court noted that fleeting displays during clothing changes or through the inmates' clothes

"would not promote the easy gang identification which defendants allege is the reason beads

facilitate gang violence." *Id*. at 208.

Here, the evidentiary record is not as developed as it was in *Campos*. Other than Defendant Farrell's declaration, Dkt. No. 45-8, Defendants have provided the Court with no information about the security concerns underlying their policy and conduct. Defendant Farrell's declaration goes into very little detail about security concerns. It is not clear from his declaration how much of Plaintiff's beads was visible around his neck or when Defendant Farrell determined the color and pattern of the beads. The Court finds it notable that, at the disciplinary hearing, Defendant Ramirez found Plaintiff not guilty of the gang activity charge. Dkt. No. 45-11 ¶ 21. Therefore, the Court finds that Defendants have not met their burden of demonstrating that a legitimate penological interest justified their conduct.

Even if Defendants had met their burden, the Court finds that Plaintiff has raised a triable issue of fact that Defendants' conduct was not rational. When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Id*. at 274-75. Here, as discussed above, it is not clear that Defendants' actions had a valid, rational connection to a legitimate governmental objective. Further, as Plaintiff notes, the fact that he was punished for wearing his beads despite having a permit for them suggests that there is no alternative means of exercising the burdened right.[6] Therefore, Defendants' motion for summary judgment dismissing Plaintiff's First Amendment free exercise claim on its merits is denied.

_____

[6] There is no evidence before the Court on the third and fourth factors.

### *2. Qualified Immunity*

Defendants argue that even if they are not entitled to summary judgment on the merits of Plaintiff's First Amendment claim, they are shielded from liability by the defense of qualified immunity.  Dkt. No. 45-12 at 15-18.  Defendants are correct.

Defendants in civil rights actions are entitled to qualified immunity from civil damages "unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Williams v. Smith*, 781 F.2d 319, 322 (2d Cir. 1986) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 815 (1982)). Thus, the qualified immunity inquiry in a prisoner civil rights case involves two issues: (1) "whether the facts, viewed in the light most favorable to the plaintiff, establish a constitutional violation"; and (2) "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted."  *Sira v. Morton*, 380 F.3d 57, 68-69 (2d Cir. 2004) (citations omitted); *accord Higazy v. Templeton*, 505 F.3d 161, 169, n.8 (2d Cir. 2007) (citations omitted).

Here, as discussed above, the facts viewed in the lights most favorable to Plaintiff establish a constitutional violation.  The issue, then, is whether it would have been clear to a reasonable officer in Defendants' positions that his conduct was unlawful in the situation confronted.

 In determining whether it would be clear to a reasonable officer that his conduct was unlawful in the situation confronted, courts in this Circuit consider three factors: (1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.  *Jermosen v. Smith*, 945 F.2d 547, 550 (2d Cir. 1991) (citations

omitted), *cert. denied*, 503 U.S. 962 (1992); *see also Pena v. DePrisco*, 432 F.3d 98, 115 (2d Cir. 2005); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999); *McEvoy v. Spencer,* 124 F.3d 92, 97 (2d Cir. 1997); *Shechter v. Comptroller of City of New York,* 79 F.3d 265, 271 (2d Cir. 1996); *Rodriguez v. Phillips*, 66 F.3d 470, 476 (2d Cir. 1995); *Prue v. City of Syracuse*, 26 F.3d 14, 17-18 (2d Cir. 1994); *Calhoun v. New York State Division of Parole*, 999 F.2d 647, 654 (2d Cir. 1993).

In determining whether the right in question in a particular case was defined with reasonable specificity, courts must avoid "framing the constitutional right at too broad a level of generality." *Redd v. Wright*, 597 F.3d 532, 536 (2d Cir. 2010). Characterizing the right at question in a prisoner's First Amendment religion case as the right "not to be subjected to punishment . . . as a consequence of his religious beliefs," for example, is not "reasonably specific." *Id.* Here, the right in question is best framed as the right to wear Santeria beads that are visible at the neck. This right has not been defined with reasonable specificity, the decisional law of the Supreme Court and the Second Circuit does not support the existence of the right in question, and under preexisting law a reasonable defendant official would not have understood that his or her acts were unlawful. In particular, Defendants could not reasonably have been expected to understand that their acts were unlawful because the policy at issue in this case was created as a result of the *Campos* litigation and thus, to some degree, bears the imprimatur of the federal courts. Therefore, the Court finds that Defendants are shielded by the doctrine of qualified immunity from Plaintiff's claims for damages.

The defense of qualified immunity does not bar claims for declaratory or injunctive relief. *Sudler v. City of New York*, 689 F.3d 159, 177 (2d Cir. 2012). In this action, Plaintiff asserts claims for declaratory and injunctive relief. Dkt. No. 1 at 15. As the Court noted in its previous

order, however, Plaintiff's claims for declaratory and injunctive relief were mooted by his transfer from Eastern Correctional Facility to Woodbourne Correctional Facility. Dkt. No. 42 at 6. Therefore, the Court dismisses Plaintiff's First Amendment claim in its entirety.

**D.    RLUIPA**

Plaintiff asserts a claim under the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Dkt. No. 1 at 14. Defendants have not addressed this claim. Dkt. No. 45-12. For the reasons discussed below, the Court will sua sponte dismiss Plaintiff's RLUIPA claim.

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution[7] . . . unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). RLUIPA does not authorize monetary damages against state officers in their official capacities. *Sossamon v. Texas*, 131 S. Ct. 1651 (2011). In addition, the Second Circuit has recently held that RLUIPA does not create a private right of action against state officers in their individual capacities. *Washington v. Gonyea*, __ F.3d __, No. 11-980-cv, 2013 U.S. App. LEXIS 18759, 2013 WL 4792375 (Sept. 10, 2013) (per

---

[7] An "institution" is any facility or institution that is "owned, operated, or managed by, or provides services on behalf of any State" and is, *inter alia*, "for persons who are mentally ill, disabled, or retarded, or chronically ill or handicapped" or "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1) (2010).

curiam).[8]  As discussed above, Plaintiff's claims for declaratory and injunctive relief are moot.

Therefore, Plaintiff's RLUIPA claims are dismissed.


**E.     Retaliation**

Plaintiff claims that Defendants Farrell, Leifeld, and Friedman retaliated against him for

having a dispute with Defendant Friedman.  Dkt. No. 1 at 11, 14.  Plaintiff also argues that

Defendant Farrell wrote the misbehavior report in retaliation for Plaintiff requesting the names of

the officers who confiscated his beads.  Dkt. No. 48 at 8.  Defendants move for summary

judgment dismissing this claim.  Dkt. No. 45-12 at 8-11.

Claims of retaliation find their roots in the First Amendment.  *See Gill v. Pidlypchak*, 389

F.3d 379, 380-81 (2d Cir. 2004).  Central to such claims is the notion that in a prison setting,

corrections officials may not take actions that would have a chilling effect upon an inmate's

exercise of First Amendment rights.  *See Gill*, 389 F.3d at 381-383.  Because of the relative ease

with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation

claims with particular care.  *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).  As the

Second Circuit has noted,

> [t]his is true for several reasons.  First, claims of retaliation are difficult
> to dispose of on the pleadings because they involve questions of intent and
> are therefore easily fabricated.  Second, prisoners' claims of retaliation
> pose a substantial risk of unwarranted judicial intrusion into matters of
> general prison administration.  This is so because virtually any adverse
> action taken against a prisoner by a prison official – even those otherwise
> not rising to the level of a constitutional violation – can be characterized
> as a constitutionally proscribed retaliatory act.

---

[8] The Court will provide Plaintiff with a copy of all unpublished decisions cited in this
Order in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d
Cir. 2009) (per curiam).

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

To state a retaliation claim under 42 U.S.C. § 1983, a plaintiff must allege facts plausibly suggesting that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff – namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action – in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff.  *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Gill*, 389 F.3d at 380 (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d. Cir. 2001)).

Defendants argue that Plaintiff cannot establish the first element of his retaliation claim against them because he was not engaged in protected conduct when he had a verbal dispute with Defendant Friedman.  Dkt. No. 45-12 at 10.  Defendants are correct.  Further, although Defendants do not explicitly address Plaintiff's claim that Defendant Farrell retaliated against him for requesting the names of the officers who confiscated his beads, the same logic and precedent applies.  The filing of a grievance against prison officials is constitutionally protected conduct. *Scott v. Coughlin*, 344 F.3d 282, 288 (2d Cir. 2003);  *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir. 1996).  However, verbal confrontations between inmates and prison officials are not protected by the First Amendment.  *Carl v. Griffin*, No. 08 Civ. 4981 (RMB) (MHD), 2011 U.S. Dist. LEXIS 20639, at *14-15, 2011 WL 723553, at *5 (S.D.N.Y. Mar. 2, 2011) (collecting cases).  Here, Plaintiff alleges that Defendants retaliated against him on the basis of verbal confrontations.  He has thus failed to show that he was engaged in protected conduct.  Therefore, Defendants' motion for summary judgment dismissing Plaintiff's retaliation claims is granted.

**F.      Due Process**

Plaintiff alleges that Defendants violated his right to due process.  Dkt. No. 1 at 14-15.

Read broadly, the complaint asserts due process claims against Defendant Ramirez for his

conduct at the disciplinary hearing, Defendant Farrell for issuing the misbehavior report, and

Defendant Farrell for confiscating Plaintiff's beads.  *Id.*  Defendants move for summary judgment

of the due process claims against Defendants Ramirez and Farrell, arguing that (a) Plaintiff was

not deprived of a liberty interest; and (b) Plaintiff received due process.  Dkt. No. 45-12 at 11-14.

Defendants have not addressed the potential due process claim regarding the confiscation of

Plaintiff's beads.

### *1. Due Process Claim Against Defendant Ramirez*

In order to state a claim for violation of his procedural due process rights, a plaintiff must

allege facts plausibly suggesting that he was deprived of a liberty interest without due process of

law.  *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000).  An inmate has a liberty interest in

remaining free from a confinement or restraint where the confinement or restraint imposes "an

atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."

*Sandin v. Conner*, 515 U.S. 472, 484 (1995); *Tellier*, 280 F.3d at 80; *Frazier v. Coughlin*, 81 F.3d

313, 317 (2d Cir. 1996).  In the Second Circuit, determining whether a disciplinary confinement

constituted an "atypical and significant hardship" requires examining "the extent to which the

conditions of the disciplinary segregation differ from other routine prison conditions and the

duration of the disciplinary segregation compared to discretionary confinement."  *Palmer v.*

*Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Where a prisoner has served less than 101 days in disciplinary segregation, the confinement constitutes an "atypical and significant hardship" only if "the conditions were more severe than the normal SHU conditions."[9] *Id.*

Here, Plaintiff served only forty-five days in keeplock as a result of the misbehavior report and disciplinary hearing. He does not allege, and has not submitted evidence, that the conditions in which he served that keeplock sentence were more onerous than normal SHU conditions. Thus, Plaintiff was not deprived of a liberty interest. Therefore, the Court grants Defendants' motion for summary judgment dismissing the due process claims against Defendant Ramirez.

Even if Plaintiff had raised a triable issue of fact regarding the deprivation of a liberty interest, the Court would grant the motion for summary judgment. Due process is satisfied if an inmate facing disciplinary charges receives (1) advanced written notice of the charges against him; (2) a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; (3) a fair and impartial hearing officer; and (4) a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *Wolff v. McDonnell*, 418 U.S. 539, 563-67 (1974); *Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004).

Regarding written notice, fair notice requires the charging officer "to be sufficiently specific as to the misconduct with which the inmate is charged to inform the inmate of what he is accused of doing so that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report." *Taylor v. Rodriguez*, 238 F.3d 188, 192-93

---

[9] "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride*, 380 F.3d 649, 655 (2d Cir. 2004).

(2d Cir. 2001) (punctuation and citation omitted).  Here, Plaintiff does not dispute that he received fair notice.  Dkt. No. 45-2 ¶ 39; Dkt. No. 48-1 ¶ 39.

Regarding the right to call witnesses and present evidence, an inmate's right to call witnesses is not the same as a defendant's in a criminal trial, but rather is qualified by the circumstances of prison life.  *Wolff*, 418 U.S. at 566-67.  The Supreme Court has stated that disciplinary hearing officers must have the discretion to deny witnesses, noting that valid bases for the denial of witnesses would include irrelevance, lack of necessity, and other hazards particular to each case.  *Id*.  Here, Defendant Ramirez found that Plaintiff's sister's testimony would be unnecessarily duplicative of Deacon Doherty's testimony and of the information contained in Plaintiff's file and Directive 4202.  Dkt. No. 45-4 at 9.[10]  Plaintiff withdrew his request for the Deacon's testimony.  *Id*. at 17.  These were valid bases for denying the witnesses.

Regarding the third factor, it is well settled "that the degree of impartiality required of prison hearing officials does not rise to the level of that required of judges generally."  *Espinal v. Goord*, 180 F. Supp. 2d 532, 539 (S.D.N.Y. 2002) (citing *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir.1989)).  Due process in this context requires only that the hearing officer's decision not be "arbitrary."  *Wolff*, 418 U.S. at 571.  A decision is not "arbitrary" if it is supported by "some evidence."  *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).  "This standard is extremely tolerant and is satisfied 'if there is *any* evidence in the record that supports' the disciplinary ruling."  *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (emphasis in original) (quoting *Friedl v. City of New York*, 210 F.3d 79, 85 (2d Cir. 2000)).  Here, the evidence that Defendant Ramirez received during the hearing supports his decision.  Therefore, the Court would grant Defendants' motion

---

[10] Citations to page numbers in the transcript of Plaintiff's disciplinary hearing refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

for summary judgment on the due process claim against Defendant Ramirez even if Plaintiff had been deprived of a liberty interest.

### 2. Due Process Claim Against Defendant Farrell

Plaintiff argues that Defendant Farrell violated his right to due process by issuing the misbehavior report.  Dkt. No. 1 at 14.  In the procedural due process context, the Second Circuit has held that while a prisoner "has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," he *does* have "the right not to be deprived of a protected liberty interest without due process of law." *Freeman*, 808 F.2d at 951.  Where a prisoner is falsely accused of violating disciplinary rules, and a hearing is held on the allegedly false charges that comports with the procedural due process standards set forth by the Supreme Court in *Wolff*, and any resulting guilty finding is based on "some evidence," the correctional officer's filing of unfounded charges does not give rise to procedural due process liability.  *Freeman*, 808 F.2d at 953-54.  Here, as discussed above, Plaintiff received a hearing that comported with the *Wolff* due process standards.  Therefore, Defendants' motion for summary judgment dismissing the due process claim against Defendant Farrell is granted.

### 3. Due Process Claim Regarding Confiscation of Beads

Read broadly, the complaint may assert a claim that Plaintiff was deprived of property without due process of law.  Dkt. No. 1 at 14.  Defendants have not addressed this claim.

"[A]n unauthorized intentional deprivation of property by a state employee does not constitute a violation of the procedural requirements of the Due Process Clause of the Fourteenth

23

Amendment if a meaningful postdeprivation remedy for the loss is available." *Hudson v. Palmer,* 468 U.S. 517, 533 (1984) (emphasis omitted).  The Second Circuit has held that "confiscation . . . [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of state court post-deprivation remedies" in the New York Court of Claims.  *Koehl v. Dalsheim,* 85 F.3d 86, 88 (2d Cir. 1996); *Jackson v. Burke,* 256 F.3d 93, 96 (2d Cir. 2001); *see also Parratt v. Taylor,* 451 U.S. 527, 544 (1981) ("Although the state remedies may not provide the respondent with all the relief which may have been available if he could have proceeded under § 1983, that does not mean that the state remedies are not adequate to satisfy the requirements of due process."), *overruled in part on other grounds by Daniels v. Williams,* 474 U.S. 327 (1986). Therefore, the Court *sua sponte* dismisses Plaintiff's claim that he was deprived of property without due process of law.


G.      **Equal Protection**

Plaintiff claims that Defendants violated his right to equal protection.  Dkt. No. 1 at 14. Specifically, he asserts that he was punished for wearing his beads, while other Santeria adherents were not, because he is black.  Dkt. No. 48 at 16.  Defendants move for summary judgment dismissing this claim.  Dkt. No. 45-12 at 19.

The Equal Protection Clause provides that "no State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.  This is "essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  The Equal Protection Clause "bars the government from selective adverse treatment of individuals compared with other similarly situated individuals if 'such selective treatment was based on impermissible considerations such

as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" *Bizzarro v. Miranda*, 394 F.3d 82, 86 (2d Cir. 2005) (quoting *LeClair v. Saunders*, 627 F.2d 606, 609-10 (2d Cir. 1980)).  Governmental action may also violate the Equal Protection Clause where the defendants intentionally treat the plaintiff "differently from others with no rational basis for the difference in treatment." *Id.* (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).  Thus, a plaintiff asserting an equal protection claim must prove that (1) he was treated differently from similarly situated individuals; and (2) the defendants treated him differently due to his membership in a suspect class, inhibited his exercise of a fundamental right,[11] acted out of malice, or acted irrationally and arbitrarily.

Where a plaintiff asserting an equal protection cause of action alleges that he or she was treated differently from similarly situated individuals on the basis of race, proof of racially discriminatory animus or purpose is required. *Bussey v. Phillips*, 419 F. Supp. 2d 569, 581 (S.D.N.Y. 2006).  Such intent can be shown in "several ways, including by identifying a law or policy that expressly classifies persons on the basis of race, a facially neutral law or policy that has been applied in an intentionally discriminatory manner, or a facially neutral statute or policy that has an adverse effect and is motivated by discriminatory animus." *Id.*  Here, Plaintiff has not produced any evidence that the facially neutral directive concerning the wearing of Santeria beads was applied in an intentionally discriminatory manner or in a way that had an adverse effect and

---

[11] The fundamental rights protected by the Equal Protection Clause, as identified by the United States Supreme Court, fall into six substantive categories: (1) the right to freedom of association; (2) the right to vote; (3) the right to interstate travel; (4) the right to fairness in the criminal process (which includes the right to counsel and the right of access to the courts); (5) the right to procedural due process; and (6) the right to privacy "which includes various forms of freedom of choice in matters relating to the individual's personal life" such as freedom of choice in marital decisions, child bearing, and child rearing.  2 Ronald D. Rotunda & John E. Nowak, Treatise On Constitutional Law Substance and Procedure, § 15.7 (4th ed. 2010).

was motivated by discriminatory animus.  Therefore, the Court grants Defendants' motion for summary judgment dismissing this claim.


**H.      Search and Seizure**

The complaint alleges that Defendants violated Plaintiff's Fourth Amendment right to be free of unreasonable searches and seizures.  Dkt. No. 1 at 14.  Defendants have not addressed this claim.  Prisoners have extremely limited Fourth Amendment rights.  For example, prisoners cannot assert Fourth Amendment claims regarding cell searches, even where the search is retaliatory or arbitrary.  *DeMaio v. Mann*, 877 F. Supp. 89, 95 (N.D.N.Y. 1995) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights") *aff'd*, 122 F.3d 1055 (2d Cir. Sept. 14, 1995).  Even warrantless strip searches, arguably the most invasive of all searches, conducted in a prison setting are constitutional if they are reasonably related to a legitimate penological goal and are conducted in a reasonable manner.  *Frazier v. Ward*, 528 F. Supp. 80, 81 (N.D.N.Y. 1981).  Here, Plaintiff's Fourth Amendment claim regarding the confiscation of his beads does not meet the high standard applicable in the prison setting.  Therefore, the Court *sua sponte* dismisses the claim.


### IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 45) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules; and the Court further

**ORDERS** that the Clerk shall provide Plaintiff with copies of *Washington v. Gonyea*, __ F.3d __, No. 11-980-cv, 2013 U.S. App. LEXIS 18759, 2013 WL 4792375 (Sept. 10, 2013); and *Carl v. Griffin*, No. 08 Civ. 4981 (RMB) (MHD), 2011 U.S. Dist. LEXIS 20639, 2011 WL 723553 (S.D.N.Y. Mar. 2, 2011).

**IT IS SO ORDERED.**

Dated: September 24, 2013
        Albany, New York

Mae A. D'Agostino
U.S. District Judge